## Maksimshuk et ux. *v.* Union Collieries Co., Appellant.

Argued April 23, 1937.

Before Keller, P. J., Cunning-
ham, Baldrige, Stadtfeld, Parker, James and
Rhodes, JJ.

*Edw. I. J. Gannon,* of *Hazlett, Gannon & Walter,* for appellant.

*Ella Graubart,* for appellees.

Opinion by Cunningham, J., July 15, 1937:

Plaintiffs sued in trespass to recover damages for the death of their five year old son, Joseph, who was killed on defendant's property when several tons of slate and other refuse from defendant's mine, referred to in general as "bony," was accidentally dumped upon him from an overhead bucket or car operated on an aerial cable. The jury returned a verdict for plaintiffs in the sum of $1,400 upon which the court below, after overruling defendant's motion for judgment n. o. v., entered judgment. Defendant appeals.

The accident occurred on June 21, 1934, about five o'clock in the afternoon at appellant's No. 3 mine located at Renton, Allegheny County, Pennsylvania. The boy's father was employed by appellant as a miner.

The family lived in house No. 318 of the company village located on its premises adjacent to the mine.

A row of houses at the northern end of the village faced the mine as well as the large field on which the bony, taken from the shaft as the mining progressed, was dumped. The ground directly in front of this row of houses was covered with weeds, shrubs and grass and sloped steeply down for a distance of approximately 150 feet to the southern edge of the bony dump. The mine entrance or tipple was at the western end of this field. As the bony was taken from the mine it was placed in a bony bin or steel frame structure some fifty feet above the ground at the mine entrance. From there two heavy aerial steel wire cables extended out over the central part of the bony dump in an eastwardly direction for a distance of 1500 feet to a tower 235 feet high, erected in its eastern portion. Two buckets or cable cars, each holding about three tons of bony, were so operated between the tipple and tower upon the cables that the loaded car going out from the tipple passed the empty one coming in from the tower. When the loaded car reached the desired point on the cable it was dumped by the operator stationed back in the bony bin at the tipple.

Bony had been dumped on this field ever since the mine began operation in 1917. While the exact location and extent of the dumping does not appear very clearly in the testimony, there can be no doubt that the greater part of the field, and particularly that part opposite the row of houses facing the dump, was, at the time of the accident, covered with large piles of bony, many of them fifteen to twenty feet high. A large part of the dump was, and for several years had been, burning and smoking, rendering it improbable that the operator of the cable car could see what was directly beneath it when he dumped its contents. This method of disposing of the mine refuse by carrying it

out on overhead cable cars had been in operation for only two days previous to the accident. Before that, two other methods had been used; in both of them small cars, lorries or dump carts, were run out on tracks and the dumping operation performed by employees on the cars.

About five o'clock in the afternoon of June 21, 1934, Mrs. Maksimshuk, with two of her younger children, left her house, located on the side of the village farthest away from the dump, and went to visit a sick friend who lived in one of the row of houses facing the dump. While Mrs. Maksimshuk was upstairs talking to her friend, she permitted her son Joseph to go out to play with some other boys of the village. Witnesses next saw Joseph and two other boys out on the dump, a distance of two or three hundred feet from its southern, or nearest, edge. Joseph was standing directly under the loaded cable car when it was dumped from a height of about two hundred feet. The contents fell on him, inflicting injuries from which he died in the hospital the next morning. His two companions, by running from beneath the car, barely escaped the same fate.

There is no dispute between the parties as to when, where or how the accident occurred. The case turns upon the question whether appellees have shown a violation of a duty owed by appellant to their son. Unless a breach of duty has been shown, there can be no recovery. As this court, quoting from *Fitzpatrick v. Penfield,* 267 Pa. 564, 569, 109 A. 653, 655, said in *Pietros v. Hecla C. & C. Co.,* 118 Pa. Superior Ct. 453, 457, 180 A. 119: 'To establish negligence, it must appear that some duty has been unperformed, and without the violation of the duty there can be no negligence. A duty may be imposed either through the relation of the parties or by statute, and, where there is a duty or an obligation, some right exists in another.'

The nature and extent of the duty owed appellees' son depend upon his legal status on that part of appellant's premises upon which he was standing at the time of the accident. Appellant's contention is that the only permissible inference from the testimony, even when read in the light most favorable to appellees, is that their son was a trespasser and that the only duty appellant owed him was to refrain from inflicting any intentional, wanton or wilful injury upon him. Appellees, as we understand the argument in their behalf, do not contend that the evidence brings the case under the "playground rule," as such, (*Millum et al. v. Lehigh and Wilkes-Barre Coal Co.,* 225 Pa. 214, 73 A. 1106) or within the "attractive nuisance" doctrine (*Reichvalder et al. v. Borough of Taylor,* 120 Pa. Superior Ct. 217, 181 A. 864, affirmed in 322 Pa. 72, 185 A. 270), but do earnestly insist that the evidence shows such a permissive use by appellant's employees and the members of their families of that portion of its premises upon which the accident occurred as to impose upon appellant the higher duty of ordinary care.

We think this is the crux of the case and accordingly turn to an examination of the law and the evidence bearing upon this issue. The principle upon which appellees rely is thus stated in the Restatement, Law of Torts, Section 334: "A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area thereof, is subject to liability for bodily harm there caused to them by his failure to carry on an activity involving a risk of death or serious bodily harm with reasonable care for their safety." See also Section 336.

Appellees attempted to show that the whole tract in front of the row of houses to which we have referred, including all of the old bony dump, had frequently in the past been walked over by the miners and their

families. The evidence on this point, however, is entirely too indefinite to show any crossing or walking over of the old bony dump in general, much less the part of it upon which the boy was standing when killed. Mary Pokusa testified that men crossed over the "field" and children played on the "field"; Joe Pokusa stated that "everybody walked on that field"; John Pokusa said that miners and children walked on the "field" and "across the field." Sophie Pokusa said she walked through any part of the "field" and that miners and their families walked across the "field." Another of appellees' witnesses, Mike Fundrelle, stated that "they always walked through that field and boys always played ball in that field." Finally, Mike Maksimshuk, the boy's father, testified that "they used the field for walking through and kids played all the time." This is the strongest testimony showing any use by the public of the old bony dump. Practically all of it was elicited from foreigners, who understood English imperfectly, through leading questions, the witness simply saying "yes" to what appellees' counsel suggested. Moreover, these statements must be read in connection with the other physical facts disclosed by appellees' evidence. When so read, we think it apparent that the "field" referred to by the witnesses was the above mentioned slope between the north side of the houses and the southern edge of the dump. As stated, this hillside was covered with grass, weeds and bushes, and varied in width, as shown by the draft in evidence, from 150 to 200 feet. It could be used for the purposes mentioned by the witnesses. But any finding of a jury to the effect that the miners of this village and their families frequently walked upon or over the middle of the old bony dump, where appellees' son met his death, would be without support in the evidence. It may have been that the miners, on their way to the shaft, walked between certain piles of non-burning bony at the western end,

and near the edge, of the dump. This point, however, was a "long distance" from the place the boy was injured.

When the condition of the bony dump, and its position with relation to the village and other mining property of appellant, is taken into consideration, we are of opinion that appellees did not produce evidence from which a jury could reasonably find that the children of the village, the miners or their families, had used the bony dump in general, or that portion of it where their son was standing at the time of the accident, to any such extent or over any such period of time as would show an implied consent by the company to such use. The dump itself had formerly been the hollow of an old creek bed. It does not appear very distinctly from the testimony just where the piles of bony began with reference to the houses facing the dump. The evidence does show, however, that appellees' son was 200 or more feet out on the dump when struck, and not near its border or edge. The draft shows the dump to be longer than it is wide; its width facing the houses was approximately 400 feet. The depth of the formerly deposited bony varied from thirty to forty feet at the point of the accident to one foot at the skirt or edge of the dump. The cables extended over the middle of the dump so that to have reached a point directly beneath them appellees' son must have traversed at least two hundred feet of previously dumped bony. Certainly, there is no testimony that adults or children walked in or passed over the middle of the bony dump, piled in places fifteen to twenty feet high and with a number of piles on fire, with any such frequency as to put the company on notice of their presence there.

It is at this point that the present case differs materially from that of *Weimer v. Westmoreland Water Co.*, 127 Pa. Superior Ct. 201, 193 A. 665. Testimony that the miners and their families walked "all over the

field" would not warrant a finding that they walked over that portion of the tract covered by the bony dump proper. Appellees had the burden of showing that appellant was under a duty to anticipate the presence of persons on the part of the ground used to dump bony, not on some other portion of the tract where bony was not dumped and where it would be possible for persons to walk and for children to play.

Appellees' argument that their son was not a trespasser because he lived upon appellant's land and had a right to walk between the houses and upon the ground in front of them is not convincing. Families of the miners may well have been permitted to use portions of appellant's land adjoining the village as pathways and commons, and not other portions which were wholly unfit for such use and were in fact plainly and visibly used exclusively by the company in its mining operations. The case is much the same as though a child had wandered about the mine tipple and fallen down the shaft or become entangled in the machinery there. In such event his status would clearly be that of a trespasser. Unfortunate as was the accident which gave rise to the present action, the evidence does not show the boy's status at the time to have been other than that of a trespasser on appellant's property.

It follows that appellant owed him no duty other than to refrain from inflicting upon him an intentional, wanton or wilful injury: *Thompson v. B. & O. R. R. Co.*, 218 Pa. 444, 67 A. 768; *Gillespie v. McGowan*, 100 Pa. 144; *Schiffer v. Sauer Co.*, 238 Pa. 550, 86 A. 479; *Dornick v. Wierton Coal Co.*, 109 Pa. Superior Ct. 400, 167 A. 617; *Hojecki et al. v. Phila. & Reading Ry. Co.*, 283 Pa. 444, 448, 129 A. 327; *Fitzpatrick v. Penfield*, 267 Pa. 564, 109 A. 653, and cases cited page 572; *Pietros et ux. v. Hecla C. & C. Co.*, supra, (a child eight years old fell in a hole filled with water on property of a mining company) ; *Rahe et al. v. Fidelity-Phila. Trust*

*Co.,* 318 Pa. 376, 178 A. 467; *De Carlo et al. v. Margolis,* 320 Pa. 500, 182 A. 381; *Stefan v. New Process Laundry Co., Inc.,* 323 Pa. 373, 185 A. 734; See Restatement, Law of Torts, Section 333.

The circumstance that the boy was between five and six years of age would not prevent his being held a trespasser where the facts so warranted. As the present Chief Justice stated in *Fitzpatrick v. Penfield,* supra, at page 572: "Ordinarily, the tender age of a child cannot have the effect of raising a duty where none otherwise existed, and the rule throughout the United States is that the mere fact a trespasser is a child will not create or impose on the owner of a property any duty to keep his premises safe; especially is this true in this State, where the owner does not erect on his premises an attractive appliance, or permit the land to be used as a playground for such length of time as to presuppose an invitation or permission to occupy the premises in this manner. When so used, ordinary care must be exercised to keep the premises in safe condition."

In *Thompson v. B. & O. R. R.,* supra, where a child was injured by defendant's unlocked turntable, located twelve feet from a public street and within its yard, the Supreme Court stated (p. 449) : "He was where he had no right to be, on the property of the defendant, which it was using in a lawful manner for a lawful purpose in the conduct of its business." Again, in *Dolena et ux. v. Pittsburgh Terminal Coal Co.,* 324 Pa. 228, 188 A. 112, plaintiffs' seven year old son climbed a twenty foot iron water tank on defendant's mining property near the tipple, and was drowned while swimming in the tank. The Supreme Court, holding the boy to have been an infant trespasser and that the tank did not come "under the much distorted term 'attractive nuisance'" stated (p. 230) : "Here, as in *Guilmartin v. Philadelphia,* supra, [201 Pa. 518, 51 A. 312] the death of the boy was brought about, not by a breach of defendant's

legal duty, but by his 'venturing in childish recklessness where no one, child or adult, had any business to be.' "

There is no suggestion that the injuries to appellees' son were intentionally or wilfully inflicted and the only question remaining for consideration is whether there was any evidence from which a jury could reasonably find they were the result of such wanton conduct upon the part of appellant's employees as would make the company liable for the death of a trespasser. In order to sustain the verdict upon the ground of wanton conduct appellees had the burden of showing that the acts which resulted in the injuries were committed "with a reckless disregard of the rights of others:" *Bowman v. Pennsylvania R. R. Co.*, 299 Pa. 558, 567, 149 A. 877. "The actor's conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him." Restatement, Law of Torts, Section 500. See also *De Rosa v. West Penn Rys. Co.*, 120 Pa. Superior Ct. 90, 182 A. 101.

From the evidence as we have reviewed it, it is clear that appellant was making a lawful use of its land and we find no evidence upon the record from which a jury could find that the employees of appellant had any reason to apprehend that a child would climb two hundred feet or more over smoking piles of bony and stand beneath the cables upon which the buckets were operated. We think the case is barren of evidence indicating any, let alone a high degree of, probability that harm would result to anyone from the operations there carried on. In our opinion what our Supreme Court said in *Colligen et al. v. Philadelphia Electric Co.*, 301 Pa. 87, 92, 151 A. 699, where a ten year old boy procured a

ladder and climbed into a sheet-iron enclosed electrical transformer nine feet high and was injured, is applicable here: "It is not sufficient that the instrumentality or condition may be a source of danger to children, but it must be of such a nature that danger to children is reasonably to be apprehended; and in the absence of circumstances indicating to the owner or person in charge a reasonable likelihood of danger, the doctrine of attractive nuisance does not apply."

Nor, as we understand the rule, are the elements of wanton negligence present. In other words, we are unable to find upon the record any evidence from which it could properly be found that appellant was under a duty to anticipate the presence of persons on those portions of the bony dump over which its cables extended or within the range of the debris it was discarding.

We accordingly sustain the first and second assignments, alleging error upon the part of the trial judge in refusing appellant's point for binding instructions and upon the part of the court below in subsequently overruling its motion for judgment in its favor, n. o. v.

Judgment reversed and here entered for appellant.